UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STACIE DESOUSA,

             Plaintiff,

                v.

DETROIT DIESEL CORPORATION,

             Defendant.

_____/

Case No. 18- 13020

SENIOR U. S. DISTRICT JUDGE
ARTHUR J. TARNOW

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [26]**

Plaintiff Stacie DeSousa, a female former engineer at Defendant Detroit Diesel Corporation brings suit against the company for sex-based discrimination. She alleges (1) wage discrimination under the Equal Pay Act of 1963, 29 U.S.C. § 206 (d) ("EPA"); (2) retaliation under the Fair Labor Standards Act, 29 U.S.C. § 215 ("FLSA"), Michigan's Elliot-Larsen Civil Rights Act, MCL 37.2701 (a), ("ELCRA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); (3) sex discrimination under ELCRA and Title VII; and (4) sexual harassment under ELCRA and Title VII.

Defendant filed a Motion for Summary Judgment [26] on October 29, 2019. Plaintiff filed a Response [29] on December 6, 2019. Defendant filed a Reply [30]

on December 20, 2019. For the reasons stated below, the Court **DENIES in part** and **GRANTS in part** Defendant's filed a Motion for Summary Judgment [26].

FACTUAL BACKGROUND

### I.        Defendant Hires Plaintiff

Plaintiff, Stacie DeSousa, graduated in December 2014 from the University of Michigan with a B.S. in Mechanical Engineering and a concentration in Energy. (ECF No. 26-4). Plaintiff's experience and research was largely focused on biomedical engineering. (*Id.*). After graduation, Plaintiff started working in February 2015 as a Product Development Engineer at Terumo Cardiovascular Systems. (ECF No. 26-4)*.* Defendant, Detroit Diesel Corporation, hired Plaintiff in April 2015 as an entry-level "L7" engineer. (ECF No. 26-5). Defendant manufactures engines, axles, and transmissions for trucks.

Plaintiff was hired in the Performance and Emissions Department and worked on the Aftertreatment Systems team led by hiring manager Kevin Sisken. (ECF No. 29-2, PageID.862). Sisken met with Henry Walker, Defendant's Human Resources Manager, to determine Plaintiff's salary. (ECF No. 26-23, PageID.704). Defendant uses salary bands based on engineers' experience to determine pay. (*Id.* at 705-06). Lower level grades (i.e. L1 and L2) denote more experienced employees with higher pay, while higher level grades (i.e. L6 and L7) denote less experienced employees with lower pay. L7 is the lowest salary band, reserved for entry-level engineers,

usually those who are new to the industry or have recently graduated from college. (ECF No. 26-22, PageID.608). Within each salary band or "level" is a salary range. (ECF No. 26-3). The range for the first salary band for entry level employees was $52,000 to $69,500, while the range for the second salary band for fully proficient employees was $69,500 to $87,000. (*Id.*). Walker typically creates a wage offer worksheet that includes the engineer's background including work history, educational background, salaries of other engineers, and market data. (ECF No. 26-4); (ECF No. 26-23, PageID.705-06). Walker created this document to determine Plaintiff's salary and provided it to Sisken and the top engineer at Detroit Diesel Co., who must approve the salary determination. (*Id.* at 706). Ultimately, Plaintiff was offered a starting salary of $65,000 which she accepted. (ECF No. 26-5).

## II.     2015: Plaintiff Begins Work at Detroit Diesel Co.

Plaintiff began work on a fuel injector project. (ECF No. 29-2, PageID.864). She was new to engineering engines, but Defendant has a policy of training new hires with mentorships and on-site training similar to an apprenticeship. (ECF No. 29-2, PageID.983). Plaintiff alleges that Defendant did not provide her with adequate training although she sought it. (ECF No. 29-2, PageID.867-70). Defendant claims Plaintiff was not "coming up to speed as fast as we would expect a young engineer to come up to speed." (ECF No. 26-22, PageID.611). Plaintiff did not frequently collaborate with her team, because of sex-based hostility from her male co-workers.

(ECF No. 26-22, PageID.611); (ECF No. 29-2, PageID.876-79). Sisken rated Plaintiff as "successful" during her 2016 LEAD performance review which assessed her 2015 work performance. (ECF No. 26-6). Sisken stated Plaintiff was "very familiar with the two dosing systems and worked through a variety of validation, release, and field challenges." (*Id.*). He also stated Plaintiff was "becoming an expert on [dosing] systems." (*Id.*). After the 2016 LEAD review, Plaintiff received a bonus of $2,288.54 and a 2% salary increase. (ECF No. 26-7).

### III.    2016-17: Plaintiff Transfers to New Team

In January 2016, Plaintiff was asked if she wanted to transfer to Aaron Neuman's Heavy-Duty Engine Performance and Emissions team. (ECF No. 29-2, PageID.896-97). Plaintiff agreed and began working on a thermodynamics project. (*Id.* at 896). Plaintiff says that on this team she was denied trainings and meetings with Neuman, her supervisor. (*Id.* at 901-02). Plaintiff says her mentor bullied and demeaned her while treating male mentees with respect. (*Id.* at 907, 1019-20, 1038-39). During this time, Plaintiff also alleges ongoing sexual harassment from at least six male co-workers. (ECF No. 26-13). Neuman noted that during this time, Plaintiff was "not growing at the same level as her colleagues in the L7 category." (ECF No. 26-8).

At the beginning of 2017, Plaintiff was scheduled to meet with Neuman for her LEAD performance review on her 2016 work performance. However, before the

review, Neuman met with Plaintiff and told her that her performance was not acceptable and that they would have to place her on a Performance Improvement Plan ("PIP") unless she improved. (ECF No. 29-2, PageID.909, 922); (ECF No. 26-22, PageID.619). Plaintiff ultimately received two "2 ratings" on her 2017 LEAD performance review, which were considered focus areas or things that an engineer needs to work on. (ECF No. 29-2, PageID.921-22). Neuman did not provide specific reasons for the "2 ratings," but noted Plaintiff was "not meeting expectations." (ECF No. 26-8). Nonetheless, Plaintiff received a "successful" rating on her 2017 LEAD performance review and received a 2% salary increase. (ECF No. 26-8); (ECF No. 29-2, PageID.926).

Following the review, Plaintiff and Neuman meet for daily one-on-one meetings for approximately two months. (ECF No. 26-22, PageID.623). In these meetings, Neuman told Plaintiff that she had "bad body language" and that other engineers believed she lacked a sense of urgency in her work. (ECF No. 29-2, PageID.883-84). Still, Plaintiff stated the meetings with Neuman were helpful. (*Id.* at 918). Plaintiff and Neuman mutually agreed to end the meetings in the early spring of 2017. (*Id.* at 934). Nevertheless, Plaintiff claims problems with a lack of mentorship persisted. (*Id.* at 919, 932, 935).

### a.  Defendant Makes Project Assignments for 2018

Defendant claims that in August of 2017, Neuman established the work assignments for his team members for 2018. (ECF No. 26-21, PageID.572). Neuman created a "team board" entitled "2018+ Vision" which included assignments for various engine projects set to begin in 2018. (ECF No. 26-9). Plaintiff and a male L6, engineer were assigned to work on a TCO DD13 project. (*Id.*). Plaintiff ultimately resigned in January 2018 before work on the project began. (ECF No. 26-16).

### b.  Plaintiff's August and October 2017 Meetings with Superiors

On August 3, 2017, Plaintiff participated in a "skip-level" meeting with Jason Barton, the Director of the Performance and Emissions Group. (ECF No. 29-2, PageID.939-40). "Skip-level" meetings give lower level employees access to management in a higher level. (ECF No. 26-20, PageID.544). Plaintiff claims that during the meeting, she complained of a "sexually inappropriate culture at Detroit Diesel." (ECF No. 29-2, PageID.939-42). The only example she provided of this was male engineers patronizing "bikini bars" for work meetings. (*Id.*). Barton denies ever speaking to Plaintiff about any alleged inappropriate behavior. (ECF No. 26-20, PageID.544). Plaintiff also mentioned at the meeting that she found diversity training valuable and wished it was mandatory at the company. (*Id.* at 543). Barton did not take any action after this meeting with Plaintiff. (*Id.*).

On October 2, 2017, Plaintiff and two other female engineers, Priya Rajendran and Kalpana Konnur, met with Barton and Matt Baird, the former Department Director, to discuss "issues [they] had at Detroit Diesel pertaining to being" women. (ECF No. 29-2, PageID.948-49). The women raised issues about lack of authority given to women, lack of mentorship, sexual harassment, and the discriminatory treatment. (*Id.* at 952-54). Barton and Baird, however, claim they never discussed sexual harassment, because when the women were questioned about the topic, they claimed they did not have those concerns. (ECF No. 26-20, PageID.547); (ECF No. 26-19, PageID.519). Plaintiff could not recall which specific instances of sexual harassment were mentioned but testified they did discuss it with the supervisors in this meeting. (ECF No. 29-2, PageID.953-55). Barton and Baird did not take any action after the meeting.

### IV.    Diversity and Inclusion Resources at Detroit Diesel Co.

After the October meeting, meetings to "raise awareness for diversity and inclusion" started taking place. (ECF No. 26-22, PageID.644-45). A diversity training was also made available to Detroit Diesel Co. managers, although it was not required. (ECF No. 26-23, PageID.713, 726). Women at Detroit Diesel Co. also formed a women's group to discuss issues female engineers faced. (ECF No. 26-20, PageID.549). Plaintiff claims that during the women's group meetings, women would share their experiences of sexual harassment and one woman even shared that

she "cr[ied] in her office because it was so hard working the lab as the only woman." (ECF No. 29-2, PageID.965).

### V.     Plaintiff's First Undisputed Complaints of Sexual Harassment

Later in October of 2017, Plaintiff complained of sexual harassment and gender bias to Neuman, although he was transferred to a different team and was no longer Plaintiff's supervisor. (ECF No. 26-22, PageID.641). Neuman reported Plaintiff's concerns to Walker in Human Resources. (*Id.*). During that same time, Plaintiff also told her current supervisor, Martin, about sexual harassment in the workplace, but he was already aware of the issues after being informed by Neuman. (ECF No. 26-21, PageID.571). After learning this information, Walker approached Plaintiff and asked her to send him an email about Plaintiff's "general thoughts pertaining to [her] recent discussions with Baird and Barton about [her] issues with harassment and discrimination in the workplace." (ECF No. 29-2, PageID.968).

On November 1, 2017, Plaintiff sent Walker an email regarding separate instances categorized under (1) sexual harassment, (2) lack of mentorship, (3) lack of authority, and (4) bullying. (ECF No. 26-13). Plaintiff met with Walker to discuss these issues and later sent an email detailing another instance of "lack of mentorship." (*Id.*). In total, Plaintiff detailed seventeen separate incidents across each category, including repeated unwanted touching by a male employee whom Plaintiff had to push him to stop the advances. (*Id.*). Plaintiff named seven witnesses

to some of the incidents and emphasized that male engineers do not deal with the same issues. (*Id.* at 369).

## VI.    Human Resources' Investigation of Plaintiff's Allegations

Walker began an investigation of Plaintiff's allegations and interviewed nine people between November 10, 2017 and December 5, 2017. (ECF No. 26-14). Walker spoke with two female employees, Plaintiff, and each person she made accusations against, except for those who no longer worked at Detroit Diesel Co. (*Id.*); (ECF No. 26-23, PageID.722). Walker did not attempt to talk to the man that asked Plaintiff to go to a "bikini bar," because he no longer worked at the company at the time of the investigation. (ECF No. 26-23, PageID.720-21). Walker was also unable to talk in detail to a man Plaintiff accused of sexually harassing her, because the worker's Union representative was unwilling to cooperate. (ECF No. 26-14, PageID.367-68). Walker also did not attempt to identify the unidentified man who followed Plaintiff to her car and sent her messages online.[1] (ECF No. 26-14). Walker drafted a report of his investigation on December 13, 2017. (*Id.*).

According to Walker's report, Michael Thiel, a man who many people had witnessed hug and touch Plaintiff against her wishes, was formerly reprimanded with a written warning. (*Id.* at 381). Walker concluded that each of Plaintiff's other

---

[1] The record is not clear as to whether the unidentified man was directly employed by Defendant, was a contracted worker, or worked in the same facility as Plaintiff. (ECF No. 26-13, PageID.367).

allegations were "subjective" and "difficult to identify after the fact." (*Id.*). Many of the men Walker talked to either denied the allegations, claimed there was a misunderstanding, or that they had not intended to upset her. (*Id.*). Walker wrote: "Stacie does not feel respected by her colleagues and tends to show a level of ultra-sensitivity regarding gender topics perceived or otherwise." (*Id.*). He also noted that he believed Stacie is well-respected among her colleagues. (*Id.*). However, Walker also stated that the company had "need for more cultural diversity training as it relates to gender" and that there was a growing concern from women engineers. (*Id.*). Walker wrote his "hope is to bridge this gap with the help of the female engineering population." (*Id.*).

Walker spoke with Plaintiff about his investigation and told her that Thiel was disciplined. (ECF No. 29-2, PageID.1048-49). Two of the men Plaintiff named in her complaint to Human Resources offered to talk with Plaintiff, but Plaintiff told Walker she did not wish to discuss the issues with them. (ECF No. 26-23, PageID.714-15). Plaintiff testified that both the Union member and Thiel did not bother her after she made her complaints; however, the "day-to-day" harassment continued. (ECF No. 29-2, PageID.998). (ECF No. 29-2, PageID.1052-53). Thiel harassed other women, and the unidentified man continued to send messages to Plaintiff. (*Id.*).

### VII.   Plaintiff Gives Presentation Highlighting Skills to Supervisor

In December 2017, Plaintiff created a PowerPoint detailing her skills and accomplishments. (ECF No. 29-2, PageID.971-73). Plaintiff presented the PowerPoint to Martin and advocated for a promotion to an L6 Engineer position. (*Id.* at 975). Martin claims he told Plaintiff that promotions from one level to another are discussed during 2017 LEAD performance reviews at the beginning of 2018. (ECF No. 26-21, PageID.576). Plaintiff claims that Martin told her that she should be getting paid more. (ECF No. 29-2, PageID.973). Plaintiff also claims that the next day, Martin told her she would not be getting a promotion. (*Id.* at 977). Martin denies this. (ECF No. 26-21, PageID.576).

### X. Plaintiff Resigns

In January of 2018, Plaintiff submitted her letter of resignation citing "sexism," having "coworkers talking about her butt or unsolicited touching," and being "bullied by more powerful men" as her reason for leaving. (ECF No. 26-16). She wrote: "I am disappointed DDC has been unable to provide me with opportunities equal to my male coworkers and unable to provide me with a safe and comfortable working environment." (*Id.*). Plaintiff's last day of work was February 9, 2018. (*Id.*).

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (a). The moving party has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Additionally, the Court views all of the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 255.

## ANALYSIS

### I. WAGE DISCRIMINATION

To establish a prima facie case of wage discrimination against an employer under the EPA "a plaintiff must show that the employer paid an employee of the opposite sex different wages for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan,* 417 U.S. 188, 195 (1974).

Once a plaintiff has proven her prima facie case, the burden shifts back to the defendant to provide one of four affirmative defenses by a preponderance of the evidence: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998); *Kovacevich v. Kent State University,* 224 F.3d 806, 826 (6th Cir. 2000). If necessary, a plaintiff may be required to produce evidence that the "employer's proffered reason for the wage differential is pretextual," but only if a reasonable jury could solely find for the defendant regarding its affirmative defenses. *Beck-Wilson v. Principi,* 441 F.3d 353, 365 (6th Cir. 2006).

### a.   Prima Facie Case

Defendant contends Plaintiff has not established a prima facie EPA claim, because Plaintiff was not performing "substantially" equal work to "employees of the opposite sex [who] were paid differently." *Odomes v. Nucare, Inc.,* 653 F.2d 246, 250 (6th Cir. 1981). At the prima facie stage, it is necessary to compare job duties rather than job qualifications. *Beck-Wilson,* 441 F.3d at 363. "Factors like education and experience" are elements of establishing a defendant's affirmative defense rather than a plaintiff's prima facie case. *Id.*

Plaintiff compares herself with four male employees who received a higher salary: Rian Johnson, Anirudha Toraskar, Sam Everett, and Forrest Coghill. (ECF

No. 29-2, PageID.1066-67). Plaintiff has not established a prima facie case regarding Johnson, her replacement[2], and Toraskar, because they were not performing substantially equal work. Johnson and Toraskar were L6 Engineers while Plaintiff was an L7 Engineer. Plaintiff also cannot establish a prima facie case regarding Sam Everett, because this claim was improperly raised for the first time in her Response brief opposing summary judgment. Even though, when Plaintiff was asked in her deposition who the male employees were who were paid more than her for the same work, she did not name Everett. Plaintiff is bound to this testimony[3]. *Michigan Reg'l Council v. Infinity Homescapes,* 2018 WL 1726643, *7 (E.D. Mich. 2018) (holding that parties are bound to deposition testimony).

Plaintiff has established a prima facie case under the EPA regarding Forrest Coghill, because Coghill, a man, was paid more than Plaintiff, a woman, for substantially equal work. (ECF No. 26-17, PageID.396). Both Coghill and Plaintiff were L7 Engineers. (ECF No. 29-2, PageID.1066). Coghill's starting pay was $70,000; Plaintiff's starting pay was $65,000. (ECF No. 30-2). Defendant does not dispute these facts.

---

[2] Plaintiff does not explicitly name Rian Johnson in her complaint. She does, however, claim that "her replacement . . . received a higher pay and title" for the same work she was doing. (Compl. ¶ 13). Then in her deposition, Plaintiff identifies Johnson as her replacement. (ECF No. 29-2, PageID.1066); *see also* (ECF No. 29-7, PageID.1491).
[3] Even if the Court considered Everett, Defendant would still be entitled to summary judgment on this claim, because it has shown that Everett's extensive prior work experience was used to determine his salary. (ECF No. 30-2).

### b.    Affirmative Defenses

After a plaintiff establishes a prima facie case under the EPA, the burden shifts to the defendant to prove affirmative defenses to the claim. Affirmative defenses do not exist to provide defendants with an opportunity to merely suggest possible, non-discriminatory explanations for pay discrepancies. *Kienzle,* 903 F. Supp 2d at 546. As such, a defendant's affirmative defense must be rooted in a "legitimate business reason." *EEOC v. J.C. Penney Co., Inc.* 843 F.2d 249, 253 (6th Cir. 1988). To establish an affirmative defense, sex cannot be part of the basis for wage differential. *See Brennan v. Owensboro-Daviess County Hospital,* 523 F.2d 1013, 1031 (6th Cir. 1975).

Defendant establishes an affirmative defense by providing evidence that factors other than sex such as seniority, education, and relevant experience were used to determine Plaintiff's and Coghill's salary. Both Coghill and Plaintiff studied Mechanical Engineering at the University of Michigan. (ECF No. 26-4); (ECF No. 26-10). The similarities between Coghill and Plaintiff end there. Although Plaintiff had no prior experience working on engines or with vehicles, she was hired after working as a Product Development Engineer at Terumo Cardiovascular Systems for three months after graduation. (ECF No. 26-4).

By comparison, Coghill was hired straight out of college. (ECF No. 26-10). However, Coghill did have relevant experience working in vehicle engineering

positions with Rousch and Toyota. (ECF No. 26-10). Coghill was also an intern at Detroit Diesel Corporation where he gained experience working on turbocharger and exhaust gas systems. (*Id.*). Walker states he used this information to determine Coghill's salary. (*Id.*). Additionally, Coghill had relevant leadership experience from serving as Team Capitan of Michigan's Hybrid Racing Team. (*Id.*).

Walker's considerations in setting the salary of Coghill and Plaintiff are consistent with the gender-neutral criteria outlined in Defendant's Compensation & Pay Practices Policies: "education, experience, and skills the individual brings to the Company." (ECF No. 26-17, PageID.396). Defendant's evidence is not merely justification for a sex-based pay discrepancy; rather, it is affirmative evidence that gender-neutral considerations were in fact used to determine Plaintiff and Coghill's salaries.

### c.   Establishing Pretext

The EPA plaintiff is not required to prove that a defendant's proffered reasons for the wage differential are pretextual. *Buntin* 134 F.3d at 799. Rather, the EPA plaintiff only needs to raise a question of fact regarding possible pretext or fiction within defendant's affirmative defense. *Schleicher v. Preferred Solutions, Inc.,* 831 F.3d 746, 753 (6th Cir. 2016). Plaintiff has done so here.

Plaintiff raises a question of fact as to whether Defendant's affirmative defenses were pretextual, by providing evidence that Coghill was paid more when he was hired than she was paid approximately one year into her employment. (ECF No. 29-20). Further, at the start of their employment, Plaintiff had post-graduation work experience, while Coghill had none. (ECF No. 26-4); (ECF No. 26-10). Although Coghill had more experience working on engines, Plaintiff has shown sufficient evidence to prove to a jury that Defendant's affirmative defenses were pretextual. (ECF No. 26-4); (ECF No. 26-10). Therefore, Defendant's non-discriminatory compensation practices do not entitle it to summary judgment on Plaintiff's Equal Pay Act claim.

## II.   SEX DISCRIMINATION

Plaintiff alleges sex discrimination under two adverse action theories: failure to promote and constructive discharge. Each theory is discussed in turn. Courts analyze discrimination under Title VII and ELCRA under the same test. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018); *Vagts v. Perry Drug Stores, Inc.,* 204 Mich. App. 481, 487 (Mich. App. 1994). Therefore, the Court's ruling on Plaintiff's Title VII sex discrimination claim is dispositive of her ELCRA sex discrimination claim.

The *McDonnel Douglas* burden shifting framework also applies to both claims. *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 244-45 (6th Cir.

2005); *see also Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002). Under this framework, Plaintiff must first establish a prima facie case of discrimination. *Id*; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Once established, the burden of production shifts to Defendant to show that it had legitimate non-discriminatory reasons for not promoting Plaintiff. *Id.* If Defendant meets this burden, the burden then shifts back to Plaintiff to show that Defendant's proffered reasons are merely pretextual. *Id.* Plaintiff can prove pretext by showing that Defendant's proffered reason "1) had no basis in fact; 2) did not actually motivate defendant's conduct; or 3) was insufficient to warrant the challenged conduct." *Zambetti v. Cuyahoga Community College*, 314 F.3d 249, 258 (6th Cir. 2002).

### a.  Failure to Promote

A prima facie Title VII failure to promote claim requires a plaintiff show: "(1) he or she is a member of a protected class; (2) he or she applied for and was qualified for a promotion; (3) he or she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the employee's request for promotion was denied." *Nguyen v. City of Cleveland,* 229 F.3d 559, 562-563 (6th Cir. 2000). The facts necessary to establish a prima facie failure to promote claim are highly variable. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n13 (1973). As such,

"the burden of establishing a prima facie [failure to promote] claim is not onerous" *Texas Dept. of Community Affairs v. Burdine,* 500 U.S. 248, 253 (1981). Defendant contends Plaintiff has not established the second, third, and fourth elements of a prima facie failure to promote claim under Title VII.

### 1. Second and Third Elements

The second element requires Plaintiff show she applied for and was qualified for a promotion. *Nguyen,* 229 F.3d at 562. Additionally, the Sixth Circuit has made an exception to this requirement where vacant positions were not made known to employees. *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1022 (6th Cir. 2000). In such a situation, "the company is held to a duty to consider all those who might be reasonably interested in a promotion were its availability made generally known." *Id.* Plaintiff has satisfied this element.

Under Defendant's promotional system there is no vacant position that engineers apply to; rather, engineers' responsibilities and pay are increased if their performance reviews justify a promotion. Therefore, Plaintiff "never made an online application for a level 6 position." (ECF No. 29-2, PageID.978). Instead, she created a PowerPoint that included her accomplishments and showed it to Jason Martin, a supervisor, in December 2017. (*Id.* at 973). Through this presentation, Plaintiff advocated to receive a promotion. (*Id.*). Although, the typical failure to promote claim involves an open promotion and a plaintiff's rejected application to fill that

position (*Pawlaczyk v. Besser Credit Union,* 2015 WL 4208649, at *12 (E.D. Mich. 2015)), because Plaintiff's request for a promotion coincided with performance reviews, she has established that she applied for a promotion.

In addition to showing that a plaintiff applied for a promotion, the second element requires a showing that a plaintiff was qualified for the position. "A court must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge." *White* 429 F.3d at 242 (quoting *Cicero v. Borg-Warner Auto., Inc.,* 280 F.3d 579, 584–85 (6th Cir.2002)). Plaintiff provides compelling evidence that she was qualified for the promotion. She received two "successful" performance reviews, and her supervisor, Neuman, noted that he "could trust in [Plaintiff's] abilities." (ECF No. 26-6); (ECF No. 26-8). Neuman also said she was "really accelerating her development" and that she was "driving and leading." (ECF No. 26-22, PageID.623, 627, 650). Lastly, Plaintiff has shown that she was denied a promotion when Martin told her that she would not be receiving a promotion. (ECF No. 29-2, PageID.977). Therefore, Plaintiff has fulfilled the second and third elements of a prima facie failure to promote claim under Title VII.

## 2. Fourth Element

The final element of a prima facie Title VII failure to promote claim requires a plaintiff to show that "other employees of similar qualifications who were not

members of the protected class received promotions at the time the employee's request for promotion was denied." *Nyugen*, 229 F.3d at 562. Although Plaintiff shows that seven L7 male employees were promoted over the course of Plaintiff's employment while she was not, she fails to show a male employee who was promoted from L7 to L6 during the time she asked for a promotion. (ECF No. 29-7, PageID.1403-05); (ECF No. 29-21, PageID.1892-94). However, this defect is not fatal to her claim. The Sixth Circuit has stated that a plaintiff does not necessarily have to "submit such comparative evidence in order to establish a *prima facie* case." *Birch v. Cuyahoga Cty. Prob. Ct.*, 392 F.3d 151, 166 (6th Cir. 2004). It recognized that "there may be cases where there is so much evidence of a decision-maker's discriminatory animus that a plaintiff's failure to satisfy the fourth element of the *McDonnell Douglas prima facie* case is not fatal to her claim." *Id.* In this case, absence of evidence that a male employee was promoted over Plaintiff at the time she asked for a promotion can be substituted with proof that her lack of promotion resulted from a discriminatory atmosphere. *see Ercogovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998). Considering this the discriminatory atmosphere and disparate treatment of women in training and mentorship that Plaintiff alleges against Defendant (*see infra* Sec. III), and the fact that she several male L7 engineers were promoted over her during her employment, she has establish the fourth element in a prima facie failure to promote claim.

### 3. Legitimate Non-Discriminatory Reason and Pretext

Defendant asserts that Plaintiff was not promoted, because she was not qualified for the L6 position. Particularly, it emphasizes Plaintiff's slow rate of development among her fellow engineers, her involvement in a Personal Improvement Plan, and her need for supervision. (ECF No. 26-21, PageID.581); (ECF No. 29-2, PageID.909, 922). Plaintiff, however, shows that these reasons are merely pretextual. She points to testimony from her supervisor, Neuman, who stated that by March 2017, when their PIP meetings ended, Plaintiff was "coming up to speed," made "noticeable improvement," and "her technical aptitude was better and she was really driving and leading better." (ECF No. 29-7, PageID.1369, 1478). Newman also stated that he stopped meeting with Plaintiff one-on-one, "because [he] felt confident that she could handle herself" and he "could trust in [DeSousa's] abilities". (*Id.* at 1487, 1479).

Additionally, up until Neuman stopped being her manager in October 2017, he thought Plaintiff "was really accelerating her development and making some pretty good improvements and being a really good contributor at that point." (*Id.* at 1385). This contradictory evidence regarding why Plaintiff was not being promoted creates a genuine dispute for the fact finder to resolve. Therefore, Defendant is not entitled to summary judgment with regard to Plaintiff's Title VII failure to promote claim.

### b.  Constructive Discharge

Constructive discharge is as an actionable adverse employment action sufficient to establish a prima facie Title VII discrimination claim. *Logan v. Denny's Inc.,* 259 F.3d 558, 559 (6th Cir. 2001). To establish constructive discharge, Plaintiff must provide evidence that "1) 'the employer ... deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit.'" *Id.* at 568-569 (quoting *Moore v. KUKA Welding Sys.,*171 F.3d 1073, 1080 (6th Cir.1999)). This claim requires Plaintiff to demonstrate "working conditions [were]… so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." *Smith v. Henderson,* 376 F.3d 529, 533-534 (6th Cir. 2004).

Employer actions that may be relevant to determining whether an employer deliberately created reasonably intolerable working conditions include: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Logan,* 259 F.3d 569 (citing *Brown v. Bunge Corp.,* 207 F.3d 776, 782 (5th Cir. 2000)). An employer's intent may be proven by examining the foreseeable impact

of the employer's actions on the plaintiff. *Yates v. Avco. Corp.,* 819 F2d 630, 637 (6th Cir. 1987). Additionally, a plaintiff is required to show aggravating factors to prove her constructive discharge case, because proof of discrimination alone is not sufficient. *Geisler v. Folsom*, 735 F.2d 991, 996 (6th Cir. 1984). The D.C. Circuit has found aggravating factors present where a woman repeatedly complained of discrimination, but her employer never attempted to remedy the issues and where she was continuously denied promotions that both she and her co-workers anticipated she would receive. *Clark v. Marsh*, 665 F.2d 1168, 1174 (D.C. 1981).

Plaintiff contends she was constructively discharged based on: (1) her reassignment to the DD13 engine project; (2) being denied a promotion; and (3) being subjected to a hostile work environment that Defendant did not appropriately remedy. First, Plaintiff notes that the DD13 engine project would require a more complex and heavier workload. (ECF No. 29-2, PageID.982). Second, despite this new role, she was informed that she would not be receiving a promotion, constituting a continuation of her employment on less favorable terms. (*Id.* at 977). Third, Plaintiff alleges that Defendant did not sufficiently remedy her complaints of discrimination and harassment. Because there is evidence in the record to create a question of fact as to whether these incidents occurred or as to how they occurred, there is a genuine dispute of material fact as to whether they constitute constructive discharge.

In *Logan v. Denny's, Inc.,* the Sixth Circuit found that the plaintiff was constructively discharged, when after 10 years at *Denny's*, she was demoted from waitress to "bus boy," which constituted a reduction in salary and job responsibilities and a reassignment to menial work; additionally, she was subject to disparaging remarks about her race, and was humiliated by her employer in a calculated attempt to encourage her resignation. 259 F.3d at 569-70, 573, 578. While these employer actions do not constitute a comprehensive list of actionable activities, they "should be considered for the purposes of satisfying the first prong of the constructive discharge inquiry." 259 F.3d at 569. In contrast to *Logan*, Plaintiff's reassignment to a heavier and more complex project was an increase in assigned duties, which is "normally . . . insufficient to establish a constructive discharge as a matter of law." *Smith v. Henderson,* 376 F.3d 529 (6th Cir. 2004).

Like Logan, Plaintiff was subjected to harassment, however, Logan's harassment was never addressed by her employer. *Logan,* 259 F.3d at 571. In contrast, Defendant took some remedial measures in response to Plaintiff's complaint (e.g., investigation, discipline of co-worker, offers to address issues with co-workers identified in complaint). (ECF No. 26-14). Although there is a question of whether Defendant's actions stopped the harassment, it was vastly more appropriate than *Denny's* lack of a response in *Logan*.

However, although Plaintiff was being transferred to the "second most popular" project at the company, she was neither being promoted nor receiving an increase in pay as a result of working on a more complex project. Considering Plaintiff's intolerable working conditions with male co-workers, which Defendant was aware of, Defendant could have foreseen that this new assignment would cause Plaintiff to resign. (ECF No. 26-20, PageID.552); (ECF No. 29-2, PageID.988-89). She has therefore shown a question of fact as to whether Defendant intended her to resign. Defendant is not entitled to summary judgment on Plaintiff's Title VII constructive discharge claim.

### III.   SEXUAL HARASSMENT

#### a.  Title VII

In *Meritor Savings Bank, FSB v. Vinson,* the Supreme Court held that sex discrimination which creates a hostile work environment is actionable under Title VII. 477 U.S. 57 (1986). "To establish a prima facie case of a hostile work environment based on sex, a plaintiff must show that: (1) she is a member of a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the harassment created a hostile work environment, and that (5) the employer is vicariously liable." *Clark v. UPS,* 400 F.3d 341, 347 (6th Cir. 2005). Only the fourth and fifth elements are at issues here.

###### i.      Fourth Element - Severe and Pervasive Standard

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). Harassment relevant to a sex-based hostile work environment claim is broad and may include harassment of Plaintiff's coworkers and harassment that is "not overtly sexual in nature." *See Jackson v. Quanex Corp.,* 191 F.3d 647, 661 (6th Cir. 1999); *Williams v. General Motors Corp.,* 187 F.3d 553, 565 (6th Cir. 1999)*.* "Harassing acts of a 'continual' nature are more likely to be deemed pervasive;" however, infrequent incidents or comments do not establish a hostile work environment. *Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 333 (6th Cir. 2008); *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998).

Additionally, the harassment must be subjectively and objectively hostile. It is evident that Plaintiff found her experience working at Detroit Diesel Co. to be subjectively abusive, because she complained of harassment to Human Resources and filed a hostile work environment claim alleging the same. (ECF No. 26-13). What is in dispute, however, is whether the harassment she experienced was objectively severe and pervasive. To determine how the harassment would be perceived by a reasonable person, the Court considers "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris*, 510 U.S. at 23. These factors may guide the Court's decision; however, the severe and pervasive standard is not a "mathematically precise" standard. *Id.* at 22.

The record demonstrates the parties' contrary perceptions of Plaintiff's alleged harassment. Plaintiff testified to numerous experiences in which different male co-workers and supervisors questioned her about her sex-life, commented on her body, touched her without consent, made "patronizing" statements, declined to work with her, invited her to meals at sexually suggestive restaurants, asked her if she was pregnant, and failed to mentor her and include her in the working group, *inter alia. See* (ECF No. 29-2); *see also* (ECF No. 26-13). Additionally, in her resignation letter, Plaintiff claims Defendant was unable to provide her with a "safe or comfortable working environment" due to "sexism" and being "bullied by more powerful men." (ECF No. 26-16). Plaintiff's recounting of her harassment refers to numerous instances varying in quality, severity, and frequency. Conversely, Defendant refers to Plaintiff's alleged harassment as "isolated" and "not severe" and argues Plaintiff wrongfully uses Title VII to enforce a "general civility code for the American workplace." (ECF No. 26, PageID.313 (citing *Burlington Northern Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)).

However, looking at the facts in a light most favorable to Plaintiff, a reasonable jury could find that the harassment she experienced is objectively severe and pervasive nature. The Sixth Circuit's analysis in *Clark v. United Parcel Service, Inc*. is instructive here. 400 F.3d 341, 351 (6th Cir. 2005). In *Clark,* the Sixth Circuit affirmed the District Court's grant of summary judgment regarding Knoop's hostile work environment claim, because the harassment was too infrequent to be deemed severe and pervasive despite it being "boorish and distasteful". *Id.*

Plaintiff also similarly alleges "boorish" behavior (being asked about whether she is having sex with her boyfriend; being asked to a working dinner at "bikini bars" by her male co-workers; being hugged despite her protestations); but unlike Knoop's case, these incidents were in addition to other instances of harassment (being followed to her car by a male employee; experiencing continual hostility from male employees; being shown videos about why the #MeToo movement is wrong by a male employee, being catcalled in the plant by male employees, etc.). (ECF No. 26-13, PageID.367-70); (ECF No. 29-2, PageID.999, 1052).

Plaintiff's claim is more aligned with the facts of the named plaintiff's claim in *Clark v. UPS.* Both Plaintiff and Clark were harassed frequently and over an extended period. Over the course of approximately three years, Clark claimed 17 separate instances of harassment by her supervisor ranging from being shown inappropriate cartoons to having a vibrating pager put between her legs and asked if

it felt good. *Clark,* 400 F.3d at 345. The Sixth Circuit held that Clark's claim presented an ongoing pattern of harassment. *Id.* at 352. Similarly, Plaintiff testified to on-going harassment and demeaning remarks, varying in severity, from several men at every stage of her nearly three-year employment at Detroit Diesel Co. Plaintiff lists 17 incidents in her initial complaint to Walker; however, her testimony reveals "day-to-day" catcalls and "ogl[ing]" by men, as well as other comments Plaintiff perceived as sex-based slights. (ECF No. 26-13, PageID.367-70); (ECF No. 29-2, PageID.999, 1052). Plaintiff also rearranged her schedule to avoid working in a test cell with one man that harassed her. (ECF No. 26-14, PageID.368). The facts of Plaintiff's claim are fairly comparable to those in Clark's claim. Therefore, she has sufficiently established that her work environment was inescapably permeated with sexual harassment and sex-based ridicule.

### ii.     Fifth Element - Vicarious Liability

Defendant contends Plaintiff does not satisfy the fifth element of a prima facie hostile work environment claim, because it took appropriate remedial measures upon being notified of the alleged harassment. Different tests for determining liability apply depending on whether a supervisor or co-worker of a similar status is accused of harassing a plaintiff. Both tests are discussed separately below.

Plaintiff alleges Kevin Sisken, her supervisor, subjected her to a hostile work environment. "An employer is subject to vicarious liability to a victimized employee

for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton,* 524 U.S. at 807. A defendant may protect itself from liability in showing by a preponderance of the evidence "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

Plaintiff cannot establish a hostile work environment claim based just on Sisken's actions. Plaintiff alleges that Sisken was aware of and ignored the alleged hostile work environment Plaintiff's peers created. (ECF No. 29-2, PageID.878-79). Plaintiff briefly testified that Sisken was in meetings where men made comments like "we have a woman now. Act different" and "don't talk to the woman. You'll end up in HR." (ECF No. 29-2, PageID.831); (ECF No. 29-2, PageID.877, 878-79). Plaintiff's testimony merely implies Sisken heard these comments. (*Id.*).

Plaintiff also alleges that Sisken acted directly to create a hostile work environment. Plaintiff mentions that on a work trip in Germany Sisken told her "[she] should be grounded" for having an acquaintance drive her to meet Sisken for dinner. (ECF No. 26-14, PageID.367). Further, Plaintiff alleges Sisken did an inadequate job of mentoring her — a slight she believes to be, because of sex. (*Id.*) Plaintiff also claims that Neuman provided her with less support than the male

engineers, however, this allegation is tempered by the fact that Neuman began meeting with her one-on-one at the start of January 2017. (ECF No. 26-13, PageID.368). These limited incidents of attributed to Sisken and Neuman, even when combined with the few comments Sisken allegedly observed, are not severely and pervasively sufficient to amount to Defendant liability for a supervisor's actions. However, these incidents can be analyzed in combination with incidents attributed to co-workers throughout the course of Plaintiff's employment to establish Defendant liability.

When the harasser is a coworker, the employer is only liable if a plaintiff can "show that the employer knew or should have known of the conduct and failed to take prompt and appropriate corrective action." *Smith v. Rock-Tenn Servs*., 813 F.3d 298, 307 (6th Cir. 2016). An employer response that is "reasonably calculated to end the harassment" is generally sufficient to avoid liability. *Id.* at 311. An adequate response may include an employer-led investigation; however, it does not alone absolve an employer from liability if the response shows "indifference or unreasonableness in light of the facts the employer knew or should have known." *Faragher,* 524 U.S. at 807; *Blankenship v. Parke Care Ctrs*., 123 F.3d 868, 873 (6th Cir. 1997). A plaintiff may be barred from recovery if she unreasonably failed to seek out "the employer's preventive or remedial apparatus." *Faragher,* 524 U.S. at 807. Determining when Defendant received notice of the alleged harassment is

necessary to decide if it responded "prompt[ly] and appropriate[ly]" such that it can avoid liability. *Smith,* 813 F.3d at 307. The Court will first discuss the timeliness of Defendant's remedial measures and then whether its remedial measures were adequate to avoid liability.

### 1.  Defendant Notice of Alleged Harassment

Although Plaintiff alleges that she experienced, and Sisken witnessed, sex-based discrimination as early as May 2015, it is undisputed that neither Plaintiff nor Defendant took remedial action following these sex-based comments. More heavily contested is the substance of the conversations between Plaintiff and three higher-level employees in both August and October of 2017. Plaintiff testified that on August 3, 2017 she spoke to Jason Barton, Director of the Performance and Emissions Group, about the inappropriate behavior of co-workers and "a sexually inappropriate culture at Detroit Diesel." (ECF No. 29-2, PageID.941-42). Plaintiff testified that she gave examples about male co-workers going to "bikini bars." This notification to a superior of sex-based discrimination and harassment within the company constitutes a reasonable effort to remedy the harassment. *see Clark,* 400 F.3d at 349. Although Barton disputes Plaintiff's allegation regarding their conversation, there is no dispute that Defendant did not take remedial measures directly following this August 3, 2017 meeting. The substance of the August 3, 2017

meeting presents a question of fact regarding whether Defendant had notice of a potentially hostile work environment.

Furthermore, on October 2, 2017, Plaintiff and two other female engineers met with Jason Barton and former Department Director Matt Baird to discuss "issues [they] had at Detroit Diesel pertaining to being women," including allegations of sexual harassment and women's lack of authority and mentorship. (ECF No. 29-2, PageID.948-49); (ECF No. 29-2, PageID.953). Moreover, in late October 2017, Plaintiff told Aaron Neuman, a manager, that co-workers were making "inappropriate… advances towards her," and "ask[ing] inappropriate questions." (ECF No. 26-22, PageID.642). Plaintiff additionally "brought up concerns about… gender bias." (*Id.*). She contends Walker had notice of the harassment and did nothing. In contrast, Walker's deposition makes no mention of Neuman notifying him of the harassment. However, it is undisputed that Plaintiff sent Walker an email with her concerns on November 1, 2017. (ECF No. 26-13). Cumulatively, this evidence shows that Defendant had the requisite notice of a potentially hostile work environment three months before it took remedial measures in November 2017.

## 2.  Defendant Response to Alleged Harassment

Defendant contends its formal investigation of Plaintiff's allegations of sexual harassment and discrimination was a prompt and sufficient remedial measure to avoid liability. Plaintiff contends that Walker's formal investigation was dismissive

and indifferent and therefore not remedial. The fact that Defendant conducted an investigation, alone, does not absolve it of liability to Plaintiff. The quality and scope of Defendant's investigation must also be considered. *Smith*, 813 F.3d at 312. Whether Defendant's investigation demonstrated indifference to Plaintiff's alleged harassment and if the investigation could be expected to stop the alleged harassment is a factual question for a jury.

Of the men Walker talked to, all but two of them either denied Plaintiff's allegations, claimed he "meant nothing by his statement," or stated that "it was never his intent to make her feel like a child or to treat her badly." (ECF No. 26-14, PageID.366, 369-70). Walker failed to investigate some of the denied behaviors despite there being reported witnesses. (*Id.*); (ECF No. 26-23, PageID.716). Walker also failed talk to other women about one employee's allegedly repeated sexual harassment of female employees. (*Id.*). Another alleged harasser accused of asking Plaintiff sexually explicit questions was never questioned, because of the "Union leadership's defensive/overprotective behavior." (ECF No. 26-14, PageID.384). Despite his self-proclaimed "inconclusive" investigation, Walker recommended Plaintiff "seek support from Human Resources leadership in receiving an acceptable resolution" if the harassment continued. (*Id.*). Walker concluded that "[Plaintiff] . . . tends to show a level of ultra-sensitivity regarding gender topics perceived or otherwise." (*Id.*). Further, only one employee, who was a accused of repeatedly

touching Plaintiff, was disciplined. (ECF No. 26-15); (ECF No. 26-23, PageID.716). He received no bonus and a written warning. (*Id.*). A reasonable juror could find these facts indicative of a company that is indifferent to sexual harassment or at least not taking significant action to stop it.

On the other hand, Walker did talk to each specifically named man in Plaintiff's complaint to HR except the uncooperative Union member and a man who was no longer employed at Detroit Diesel Co. (ECF No. 26-14). Walker writes that he sees a "need for more cultural diversity training," but the record does not indicate if further steps were taken after the investigation to address the issue. (*Id.*). Despite this, Plaintiff testified that the harassment continued after the investigation, leading to her to resign. (ECF No. 29-2, PageID.1052). There is a genuine dispute of material fact as to whether a hostile work environment existed and whether Defendant took appropriate action to remedy the situation. As such, the Court denies summary judgment regarding Plaintiff's Title VII hostile work environment claim.

### b. Elliot-Larsen Civil Rights Act

The ELCRA prohibits sexual "conduct or communication [that] has the purpose or effect of substantially interfering with an individual's employment." M.C.L. §37.2103 (iii). ELCRA varies from Title VII in that it "specifically create[s] a cause of action for both sex discrimination and sexual harassment." *Haynie v.*

*State*, 468 Mich. 302 (2003). "Sexual harassment" from the prima facie Title VII standard is replaced with "unwelcome sexual conduct or communication" under Michigan law. *Id.* at 308.Otherwise, the analysis under the two statutes is the same. This means, where communications and conduct are gender-based but not sexual in nature, an ELCRA plaintiff has not established her hostile work environment claim.

### i.   Substantial Interference with Plaintiff's Employment – Hostile or Offensive Work Environment

As with the Title VII hostile work environment claim, only the fourth and fifth elements of the prima facie claim is at issue here. ELCRA applies a reasonable person standard to the determination of whether "in the totality of circumstances" a work environment was hostile or offensive. *Radtke v. Everett*, 442 Mich. 368, 394 (1993). Under ELCRA, the incidents at issue must be expressly sexual in nature.

Plaintiff has not established a prima facie hostile work environment claim under the ELCRA, because the majority of the harassment she experienced was sex-based but not explicitly sexual. Furthermore, in light of Michigan case law, her allegations are not severe or pervasive enough to establish a claim under the ELCRA. As stated previously, Plaintiff testified to numerous experiences in which different male co-workers and supervisors made "patronizing" statements, declined to work

with her, and asked her if she was pregnant[4], *inter alia. See supra* Sec. III a. However, Plaintiff provides evidence of a limited number of incidents that constitute sexual harassment under the ELCRA. Plaintiff testified that a male co-worker asked her if she has sex with her boyfriend and commented on her body. On another occasion she was asked by a male-coworker if she wanted to go to a "bikini-bar" with him. Plaintiff also testified that she expressed concern of a generally "sexually inappropriate" culture at Detroit Diesel Co.; however, she mostly provides evidence of her sex-based mistreatment using examples in which men were demeaning or patronizing. (ECF No. 26-13).

Despite Plaintiff's evidence of frequent, and certainly troubling, alleged incidents of discrimination, they are not expressly sexual and may not be considered when determining if a reasonable person would have found Detroit Diesel Co. to be a hostile or offensive workplace under the ELCRA. *see Kalich,* 679 F.3d 464 at 474. In subtracting these non-sexual incidents, Plaintiff is left with limited and sporadic instances of sexual harassment which are more akin to the facts of Knoop's case in *Clark v. United Parcel Service, Inc.* (no hostile work environment found despite three instances of being subject to a supervisor's sexual contact and explicit jokes). The instances of sexual harassment Plaintiff experienced were infrequent and neither

---

[4] The court in *Haynie* emphasized that while incidents regarding pregnancy fall under sex discrimination they do not fall under sexual harassment. 468 Mich. at 309.

objectively severe nor physically threatening. *Kalich*, 679 F.3d at 474 (no finding of a hostile work environment where a supervisor teased an employee for being gay and accused him of being a necrophiliac in front of other employees). No reasonable jury would agree that Plaintiff's work environment was hostile or offensive based on her experience with infrequent incidents of sexual harassment. Plaintiff cannot establish the fourth element of a prima facie hostile work environment claim under the ELCRA. Considering this, the Court need not evaluate whether Plaintiff can establish vicarious liability, the fifth element of a prima facie claim. Defendant is entitled to Summary Judgment regarding Plaintiff's ELCRA hostile work environment claim.

## IV.   RETALIATION

### a.  Fair Labor Standards Act

For an employee to establish a prima facie retaliation claim under the FLSA, the employee must prove: "(1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006). Parties' dispute turns on whether Plaintiff complained of Defendant's discriminatory pay practices.

There is no evidence in the record that Plaintiff ever brought a concern about pay discrepancies to the attention of personnel at Detroit Diesel Co. Plaintiff had multiple meetings with supervisors within the company while she was employed. (ECF No. 26-11); (ECF No. 26-12). The notes from those meetings do not address discussions of pay discrepancies. *Id*. Plaintiff did not testify to speaking with anyone at Detroit Diesel Co. about pay discrepancies. Additionally, within the multiple page complaint Plaintiff filed with Human Resources about her experience as a woman at Detroit Diesel Co., there are no references to pay discrepancies. (ECF No. 26-13). Plaintiff fails to establish the first element of a prima facie retaliation claim under the FLSA. Consequently, Defendant is entitled to Summary Judgment with regard to Plaintiff's FLSA retaliation claim.

### b.  Title VII & ELCRA

Title VII protects employees through an antiretaliation provision which forbids "'discriminat[ion] against' an employee or job applicant who, *inter alia,* has 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation.'" *Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 59 (2006) (quoting 42 U.S.C §2000e-3(a)). Title VII retaliation follows the *McDonnell Douglas,* burden shifting framework. *Id.* The Sixth Circuit in *Booker v. Brown & Williamson Tobacco Co., Inc.,* stated that Title VII and ELCRA retaliation laws "should be construed in the same manner." 879 F.2d. 1304, 1311-1312 (6th Cir.

1989). Therefore, the Court's ruling on Plaintiff's Title VII retaliation claim is dispositive of her ELCRA retaliation claim.

### i. Prima Facie Case

A prima facie Title VII retaliation claim requires a plaintiff to show: (1) she engaged in a protected activity; (2) her "exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health System,* 897 F.3d 763, 775 (6th Cir. 2018) (quoting *Laster v. City of Kalamazoo,* 746 F.3d 714, 730 (6th Cir. 2014)). Plaintiff engaged in a protected activity when she brought concerns about sexual harassment to her supervisor and to Human Resources in October and November 2017. Defendant admits it was aware of Plaintiff's protected activity at these times. Plaintiff and Defendant contest the third and fourth elements of this claim.

### 1. Third Element - Materially Adverse Action

A plaintiff has shown she was subject to a materially adverse employment action if a defendant's alleged actions would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington,* 548 U.S. at 68. Materially adverse actions may include but are not limited to: being heavily

scrutinized, being subject to unjustified discipline, and being subject to a purposefully unpleasant work setting. *see Hubbell,* 933 F.3d at 550.

Plaintiff claims she was subjected to materially adverse employment actions when she was assigned to the DD13 Project, "denied a promotion," subjected to animosity, and "constructively discharged." As noted in previous sections, Plaintiff has neither established a prima facie case demonstrating she was constructively discharged nor demonstrated that her reassignment to the DD13 Project materially adverse. As such, Plaintiff must demonstrate that being subject to animosity in the workplace, or not being promoted constitute materially adverse employment actions.

In *Laster v. City of Kalamazoo,* the Sixth Circuit found Laster was subject to retaliatory and materially adverse action when he "was denied training opportunities and privileges, singled out for violating at least two department policies that were selectively enforced against him, and disciplined more harshly than his peers for identical violations;" he was also subjected to a frivolous investigation. 746 F.3d at 732.

Here, although Plaintiff alleges she was denied training opportunities and was unfairly criticized in LEAD performance reviews, these instances happened before her protected activity. Instead, Plaintiff cites Henry Walker's investigation notes in which he stated Plaintiff "tends to show a level of ultra-sensitivity regarding gender

topics perceived or otherwise" as evidence of retaliation. (ECF No. 26-14). While this language may not be tactful, it did not create a "purposefully unpleasant work setting" nor did it create any culture of animus surrounding Plaintiff's complaint of sexual harassment and discrimination. *See Cecil v. Louisville Water Co.,* 301 Fed. Appx. 490, 501 (6th Cir. 2008) (finding no materially adverse employment action where negative comments were made about plaintiff and other female employees or where other employees were uncooperative with Plaintiff). In the same document, Walker also notes that Plaintiff is "well-respected" among her colleagues and that he hopes to address other concerns of the "female engineering population" at Detroit Diesel Co. (ECF No. 26-14). Further, Plaintiff testified that no one ever made negative comments about her making a formal complaint to Human Resources. (ECF No. 29-2, PageID.998). Plaintiff cannot provide evidence that Walker's investigatory conclusions are sufficient to establish a materially adverse employment action. However, as previously discussed, Plaintiff can also establish this element by showing that Defendant failed to promote her. Consequently, Plaintiff has established the third element of her prima facie case only with regard to failure to promote.

### 2. Fourth Element - Causal Connection to the Protected Activity

A Title VII retaliation plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

*University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. 338, 362 (2013). "A retaliation claim will fail unless the plaintiff shows that 'the employer would not have taken the adverse employment action but-for the design to retaliate." *Young v. McHugh,* 24 F. Supp.3d 658, 668 (E.D. Mich. 2014) (Drain, J.) (*quoting University of Texas Southwestern Medical Center,* 570 U.S. at 364) (Ginsberg, J., dissenting).

Plaintiff claims that there is a causal connection between her protected activity and not being promoted, because Defendant's reason for not promoting Plaintiff is false and pretextual. Here, Plaintiff argues that Defendant's refusal to promote Plaintiff, because she was not qualified is contradicted by her supervisor, Neuman's testimony of the improvement she had made. Plaintiff further alleges that Defendant's comments about Plaintiff's ultra-sensitivity reveals animus toward her sexual harassment and discrimination complaints. Plaintiff has established a prima facie retaliation claim under Title VII with respect to failure to promote. In the absence of Defendant's nondiscriminatory justification for its actions, summary judgment is denied.

## CONCLUSION

The Court **GRANTS** Defendant's Motion for Summary Judgment [26] with regard to Plaintiff's FLSA retaliation claim and ELCRA sexual harassment claim and **DENIES** summary judgment with regard to Plaintiff's EPA wage discrimination

claim, Title VII and ELCRA sex discrimination - constructive discharge claims, Title VII and ELCRA sex discrimination - failure to promote claims, Title VII sexual harassment claim, and Title VII and ELCRA retaliation claims.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [26] is **GRANTED** IN PART and **DENIED** IN PART.

**SO ORDERED.**

<u>s/Arthur J. Tarnow</u>
Arthur J. Tarnow
Dated: March 31, 2021          Senior United States District Judge